UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00609-GNS-DW

UNITED PARCEL SERVICE CO., et al.                                        PLAINTIFFS

v.

DNJ LOGISTIC GROUP, INC., et al.                                        DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Objection to the Magistrate Judge's April 16, 2018, Discovery Order (DN 57). For the reasons discussed below, the objection is **OVERRULED**.

### I. BACKGROUND

**A. Factual Background**

This action arises out of a billing dispute between Plaintiff United Parcel Service Co. ("UPS"), UPS Worldwide Forwarding, Inc. ("Worldwide Forwarding"), and Defendant DNJ Logistic Group, Inc. ("DNJ") and its CEO, Ralph Nabavi ("Nabavi").[1] Worldwide Forwarding contracted with UPS to transport Worldwide Forwarding's packages. (Compl. ¶ 19, DN 1). UPS, in turn, entered into a Small Package Cargo Handling Services Agreement ("Agreement") with DNJ, under which DNJ promised to transport certain of those packages across international routes on behalf of UPS. (Compl. ¶¶ 2, 18-19). Per the Agreement, UPS shipped packages from its hub in Louisville, Kentucky, to airports in Miami, Newark, and Dulles, at which point DNJ

---

[1] Worldwide Forwarding and UPS are referred to jointly as "Plaintiffs." DNJ and Nabavi are referred to jointly as "Defendants."

retrieved the packages and delivered them for shipment to common carrier airlines, such as LAN Cargo, United Airlines, Saudi Arabian Airlines, and South African Airways. (Compl. ¶¶ 36-39).

Under the Agreement, UPS was required to pay DNJ the price set forth in the attachments to the Agreement for services performed and to forward payments to DNJ within thirty days after receipt of a DNJ invoice. (Compl. Ex. 1, at 5, DN 1-2 [hereinafter Agreement]). The parties executed attachments to the Agreement, which often provided that DNJ would charge a designated "rate per kilo" for particular routes. (Agreement 12; Compl. ¶ 6). On other occasions, however, DNJ would reserve space for UPS's packages on certain airlines and charge UPS for this space. (*See* Pl.'s Mot. Compel 1-3, DN 37).

In June 2016, Plaintiffs determined that they were being overbilled by Defendants. They contend that DNJ was supposed to multiply the actual weight of the packages tendered to it by the applicable rate per kilo and invoice UPS accordingly. UPS alleges DNJ instead used inflated package weights to compute the amounts invoiced to Plaintiffs, causing DNJ to be paid more than it was owed under the Agreement. (Compl. ¶¶ 34-35, 45, 69). UPS further submits that DNJ charged them for reserved space that DNJ did not reserve. Upon discovering these practices, Plaintiffs demanded reimbursement. (Compl. ¶¶ 51-52). Defendants balked, so Plaintiffs brought this suit to recover the alleged overbillings. (Compl. ¶¶ 52-54).

B.  **Procedural History**

After initiating suit, Plaintiffs sought discovery.[2] As relevant here, Plaintiff requested discovery pertinent to DNJ's relationship with the common carriers and DNJ's tax returns. (*See, e.g.*, Pls.' Mot. Compel Ex. O, at 5-6, DN 37-5 [hereinafter Pls.' Second Interrog.]; Pls.' Mot.

---

[2] For the most part, Plaintiffs requested discovery in the form of interrogatories and requests for production. When DNJ claimed that certain of the requested documents had been destroyed, Plaintiffs provided DNJ with a list of Fed. R. Civ. P. 30(b)(6) deposition topics, many of which sought information pertinent to the destroyed documents. (*See, e.g.*, Order 6-7, DN 53).

Compel Ex. J, at 10, DN 37-10). Plaintiffs also sought information regarding the circumstances under which the Transportation Security Administration ("TSA") decertified DNJ from participation in the Indirect Air Carrier Standard Security Program ("IACSSP")—the program that allowed DNJ to tender the cargo to common carrier airlines. (*See, e.g.*, Pls.' Second Interrog. 7).

Defendants notified Plaintiffs that they would not produce the requested information, which prompted Plaintiffs to move to compel production. (*See* Pls.' Mot. Compel; Def.'s Mot. Protective Order, DN 43). In their motion, Plaintiffs contended that information regarding DNJ's relationships with the common carriers may provide support to their claim that DNJ charged them for services that they did not provide.[3] (Pls.' Mot. Compel 5). Plaintiffs also asserted that they are entitled to DNJ's tax returns for the years relevant to the parties' contractual relationship because DNJ has represented that it has no other records which would reveal its revenues.[4] Plaintiffs indicated their experts can analyze the tax returns and draw conclusions regarding DNJ's profit margins—including whether those margins are higher than usual for Defendant's line of work—to show that DNJ was overbilling Plaintiffs. (Pl.'s Mot. Compel 16-18). Finally, Plaintiffs argued that discovery regarding DNJ's IASSCP decertification is relevant to show that DNJ breached the provision in the Agreement requiring compliance with all applicable laws in providing services for Plaintiffs. (Pls.' Mot. Compel. 9-11).

---

[3] Plaintiffs also argued that discovery related to DNJ's relationships with the common carriers is relevant to rebut DNJ's claim that its invoices to Plaintiffs requested large sums of money because it was "passing on" costs to Plaintiffs. (Pls.' Mot. Compel 13).
[4] According to Defendant, it has no financial records that would reveal the revenues, expenses, and profits from its business relationship with UPS.

DNJ moved for a protective order shielding it from producing the above-described discovery. DNJ argued in its motion that it should not be required to submit information related to the terms of the agreements it entered into with the common carriers because such information is irrelevant to the question whether DNJ overbilled Plaintiffs. (Def.'s Mot. Protective Order 26-31). DNJ further contended that because this case involves a question of contract interpretation, its income is not at issue, and, therefore, its tax returns are irrelevant. (Def.'s Mot. Protective Order 18-22). Last, DNJ maintained that the documents and other information related to its IACSSP decertification are irrelevant to Plaintiffs' claims and that—because such documents contain sensitive security information ("SSI")—various federal regulations prohibit DNJ from disclosing them. (Def.'s Mot. Protective Order 22-26).

The parties' motions were then submitted to the Magistrate Judge, who held that most of the information Plaintiffs sought was discoverable. (Order 21-33). Specifically, the Magistrate Judge reasoned that Plaintiffs are entitled to know about DNJ's relationships with the common carriers because—per the terms of the Agreement—"DNJ . . . was required to deal with and enter into agreements with" those carriers.[5] (Order 25). The Magistrate Judge also concluded that "DNJ must produce its tax returns and be prepared to testify at corporate deposition about such returns to the extent they reflect financial performance" because tax returns are not privileged and are the only available documents that speak to DNJ's financial status during the pertinent time period. (Order 28-30). Finally, the Magistrate Judge held Plaintiffs could discover

---

[5] The Magistrate Judge limited Plaintiffs' discovery requests to the years the parties conducted business (2010-2016). (Order 25). The Magistrate Judge also limited the scope of one of Plaintiffs' deposition topics. Topic No. 24 sought testimony regarding "DNJ's business relationship with *any airline* to which it tendered its customers packages . . . ." (Order 24 n.9). Recognizing the breadth and possible irrelevancy of this request, the Magistrate Judge held that Nabavi, DNJ's corporate representative, need only be prepared to testify about DNJ's relationships with airlines other than the common carriers insofar as he intends to testify that DNJ's billing practices conform with industry standards. (Order 27).

information related to DNJ's IACSSP decertification because the Agreement "required DNJ to comply with all" laws, and, "[i]f the TSA decertified DNJ due to the violation of [law], or for the type of conduct alleged by UPS, such information would be directly relevant" to Plaintiffs' claims. (Order 31-33). The Magistrate Judge then explained that, to the extent such discovery contains SSI, a privilege log could address DNJ's security concerns. (Order 32).

### C. Pending Motion

DNJ objected to the Order, arguing that the Magistrate Judge's conclusions were clearly erroneous and contrary to law. (Def.'s Rule 72(a) Obj. to Court's April 16, 2018, Disc. Order, DN 57 [hereinafter Def.'s Obj.]). Plaintiffs did not submit a response to DNJ's objections, and the time to do so has passed. DNJ's objections are ripe for adjudication.

## II. JURISDICTION

The Court has jurisdiction over Plaintiffs' claims because there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332(a)(1).

## III. STANDARD OF REVIEW

Fed. R. Civ. P. 72(a) provides that the district court must consider objections to a magistrate judge's order on a non-dispositive matter and must "modify or set aside any part of the order that is clearly erroneous or contrary to law." A "magistrate judge's factual findings are reviewed under the clearly erroneous standard." *Scott-Warren v. Liberty Life Assurance Co. of Boston*, No. 3:14-CV-00738-CRS-CHL, 2016 WL 5661774, at *3 (W.D. Ky. Sept. 29, 2016) (citation omitted). "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (citation omitted). *Id.* Under this "standard only requires the reviewing court to determine if there is any evidence to support the magistrate judge's finding and that the finding was

reasonable." *Id.* (citation omitted). On the other hand, a "magistrate judge's legal conclusions are subject to the plenary 'contrary to law' standard." *Id.* (citation omitted). "A legal conclusion is contrary to law when it contradicts or ignores applicable legal principles found in the Constitution, statutes, and case precedent." *Id.* (citation omitted).

## IV. DISCUSSION

DNJ argues that the Magistrate Judge made several errors in his discovery order. The Court will discuss DNJ's objections in the context of the discovery to which they relate.

### A. Common Carrier Agreements

With respect to discoverability of information concerning its relationships with the common carriers, DNJ repeats the same argument it raised before the Magistrate Judge—i.e., that "there is nothing about DNJ's relationships with third-party airlines that could be relevant to the contract-based claims and defenses at issue." (Def.'s Obj. 16). DNJ further asserts that, if this Court finds those agreements relevant, it should limit discovery of them to the instances in which DNJ has claimed that it was passing on certain costs to Plaintiffs. (Def.'s Obj. 16).

DNJ's objections are unpersuasive. Courts interpret the Federal Rules of Civil Procedure governing discovery broadly so as to allow discovery of any "matter that bears on, or that reasonably could lead to other matter[s] that bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citation omitted). Given the breadth of allowable discovery, the Magistrate Judge's legal conclusion that Plaintiffs are entitled to discovery concerning DNJ's relationships with the common carriers is not contrary to law. *See Scott-Warren*, 2016 WL 5661774, at *3. As the Magistrate Judge explained, the primary issue in this case is whether DNJ overbilled Plaintiffs. One way to uncover DNJ's alleged overbilling practices is to compare the rates the common carriers charged DNJ with the

rates it charged Plaintiffs to see if the difference between the two rates is consistent with the Agreement. (Order 25-26). There is no merit to DNJ's argument that discovery of such information should be limited to the instances in which DNJ has claimed that it was passing on certain costs to Plaintiffs. Rather, Plaintiffs are entitled to learn the terms of those agreements in full to discern when and the extent to which DNJ may have been passing on those costs. DNJ's objection is therefore overruled.

### B. Tax Returns

Next, DNJ objects to the Magistrate Judge's conclusion that Plaintiffs are entitled to discover its tax returns for years 2010-2016 and to question corporate deponents regarding DNJ's revenues for that time period. (Def.'s Obj. 3-8). DNJ insists that its tax returns are irrelevant and that neither the Magistrate Judge's order nor Plaintiffs' filings explain how or why DNJ's general financial information and tax returns are relevant to the parties' claims and defenses. (Def.'s Obj. 4).

Again, DNJ's position is untenable. While the Magistrate Judge might not have explained how DNJ's tax returns are relevant, Plaintiffs provided an explanation in their Motion to Compel. There, they argued that their experts can analyze the tax returns and draw conclusions regarding DNJ's profit margins, which could, in turn, show that DNJ was overbilling Plaintiffs. (Pl.'s Mot. Compel 16-18). Plaintiffs also explained that the only financial information DNJ maintains regarding its revenues and expenses are its tax returns. (Pl.'s Mot. Compel. 3). In light of these circumstances, the Court is convinced that DNJ's tax returns are discoverable in that they "bear[] some relevance to the subject matter of the litigation; and . . . the information sought from the returns is not readily attainable from other sources." *Burket v. Hyman Lippitt, P.C.*, No. 05-72110, 2007 WL 3124637, at *1 (E.D. Mich. Oct. 23, 2007)

(citation omitted). Thus, though the relevance of the returns may be tenuous in some situations, the Magistrate Judge's conclusion was not contrary to law in this instance. (*See* Order 28-30); *see also Furth v. Zanic*, No. 1:06CV411, 2008 WL 11380207, at *3 (N.D. Ohio Oct. 15, 2008) (requiring production of tax returns related to the case).

### C. IACSSP Decertification

Finally, DNJ objects to the Magistrate Judge's conclusion that Plaintiffs are entitled to discover information concerning the circumstances surrounding its IACSSP decertification. (Def.'s Obj. 8-14). DNJ submits essentially the same arguments it raised before the Magistrate Judge—that the requested information is irrelevant and that it contains SSI which cannot be disclosed pursuant to federal regulations. (Def.'s Obj. 8-13).

For the most part, DNJ's arguments fail. The Magistrate Judge reasoned that information regarding the circumstances of DNJ's IACSSP decertification could be relevant if DNJ lost its certification for violating an applicable law or regulation, or engaging in overbilling similar to that which is alleged in this case. (Order 32). With respect to the first potential ground for relevancy, the Magistrate Judge explained that this action presents claims for breach of contract and that—because the Agreement between the parties required DNJ to comply with all applicable laws and regulations—discovery showing a violation of law could establish a breach of contract. (Order 31-32). The Complaint, however, does not allege that DNJ breached the Agreement by violating the law and, of course, "[t]he role of discovery . . . is to find support for properly pleaded claims, not to find the claims themselves." *See Torch Liquidating Tr. ex rel. Bridge Assoc. L.L.C. v. Stockstill*, 561 F.3d 377, 392 (5th Cir. 2009). Nonetheless, the Magistrate Judge correctly reasoned that information regarding DNJ's IACSSP status *is* relevant to the claims raised in the Complaint if DNJ lost its certification for engaging overbilling

8

practices similar to those at issue in this case.⁶ (Order 32). Thus, the Magistrate Judge's conclusion regarding the relevancy of DNJ's IACSSP decertification was not contrary to law. *See Scott-Warren*, 2016 WL 5661774, at *3.

DNJ further contends that the requested information contains SSI and cannot be produced is unavailing. As the Magistrate Judge explained:

> [I]n civil proceedings in United States District Courts, where a party seeking access to SSI demonstrates that [it] has substantial need of relevant SSI in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means, the party or party's counsel shall . . . have access to the SSI at issue in the case . . . .

(Order 32 (quoting Appropriations Act, 2007, Pub. L. No. 109-295, 120 Stat. 1355 (2006))). Given that the Magistrate Judge found that UPS has a substantial need to review the documents purportedly containing SSI the Court will overrule DNJ's objection.

Nonetheless, the Court recognizes that DNJ likely has an interest in protecting any documents containing SSI from distribution beyond that which is necessary for this litigation. As a result, the Court will restrict Plaintiffs' use of the documents in the following ways: (1) DNJ shall mark any produced documents which it believes contain SSI; (2) neither the designated documents, nor any copies, excerpts, or summaries thereof, may be disseminated to anyone other than Plaintiffs, Plaintiffs' counsel, and—to the extent necessary—this Court; (3) the documents, or any copies, excerpts, or summaries thereof, shall not be used for any purpose other than this litigation, except by court order or as otherwise required by law; and (4) to the

---

⁶ DNJ submits that the circumstances surrounding its decertification "hav[e] nothing to do with the billing dispute between UPS and DNJS"—particularly given that those events allegedly occurred *after* DNJ and Plaintiffs ended their business relationship. (Def.'s Obj. 9, 13). But as the Magistrate Judge correctly reasoned, Plaintiffs are not required to accept DNJ's characterization of the reasons for which it was decertified or the timeline of its conduct relating to the decertification. (Order 32). In other words, only discovery and review of information related to the decertification will reveal its relevance.

extent Plaintiffs find it necessary to file these documents, Plaintiffs must do so under seal. Accordingly, DNJ's objection is overruled.

V. <u>CONCLUSION</u>

For the reasons discussed above, Defendant's Objection to the Magistrate Judge's April 16, 2018, Discovery Order (DN 57) is **OVERRULED**.

**Greg N. Stivers, Judge**
**United States District Court**

July 3, 2018

cc: counsel of record