UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 3:16-CV-00609-GNS-RSE

UNITED PARCEL SERVICE CO.; and UPS
WORLDWIDE FORWARDING, INC.                                          PLAINTIFFS

v.

DNJ LOGISTIC GROUP, INC.                                             DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiffs United Parcel Service Co. and UPS Worldwide Forwarding, Inc.'s (collectively "UPS") proof of damages following the Court's entry of default judgment in favor of UPS against Defendant DNJ Logistic Group, Inc. ("DNJ"). As directed by the Court, UPS has submitted proof of its damages, and DNJ has not filed any response. (Pl.'s Mem., DN 90). For the reasons that follow, the Court awards UPS $7,778,676 in damages plus pre- and postjudgment interest. The Court also finds the awarding of costs appropriate upon submission of UPS's bill of costs, but denies UPS's request for attorneys' fees.

### I. BACKGROUND

The Court borrows from the Magistrate Judge's Findings of Fact, Conclusions of Law, and Recommendation ("R&R"). UPS brought this action against DNJ alleging breach of contract, negligent misrepresentation, and unjust enrichment. (R&R 1, DN 88). UPS and DNJ entered into a Small Package Cargo Handling Services Agreement ("Agreement") in 2010. (R&R 1-2). Pursuant to the Agreement, DNJ, a provider of freight forwarding services, was contracted to move small package cargo for UPS along certain international routes that UPS did not routinely fly. (R&R 2). The Agreement provided that for services performed, "DNJ would charge a specified rate per kilogram for particular routes . . . and UPS would "forward payments to [DNJ] no later

1

than thirty (30) days after receipt of a [DNJ] invoice." DNJ provided services under the Agreement from September 2010 until DNJ terminated the Agreement on July 22, 2016. In June 2016, just before DNJ terminated the Agreement, UPS discovered that it was being overbilled by DNJ. The Agreement essentially provided that "DNJ would invoice [UPS] for the actual weight of the packages [UPS] tendered to DNJ, multiplied by the agreed-upon rate per kilogram for the lane segment at issue." At DNJ CEO Ralph Nabavi's direction, however, DNJ used inflated package weights to compute the amounts provided in DNJ's invoices, which caused UPS to pay DNJ more than what UPS owed under the Agreement.

UPS confronted DNJ and demanded remuneration. DNJ denied UPS's allegations, started returning packages, and refused to further perform its services. On July 22, 2016, in accordance with the Agreement, DNJ served UPS with a notice of termination. Thirty days later, the Agreement was terminated. The following month, UPS initiated this suit. (R&R 3).

In lieu of answering the Complaint, DNJ moved to dismiss the lawsuit premised on UPS's failure to state a claim upon which relief could be granted. While the Court dismissed some claims, UPS's breach of contract and unjust enrichment claims against DNJ survived. (Mem. Op. & Order 20, DN 23).

Following the Court's order, DNJ filed an Answer and Counterclaim against UPS. (Answer & Countercl., DN 24). During the course of discovery, there were extensive delays caused by DNJ, which resulted in UPS moving for sanctions. Upon review of the Magistrate Judge's extensive analysis, this Court found the recommended sanction, default judgment against DNJ, appropriate and entered judgment accordingly. (Order 1-2, DN 89). The Court delayed its damages determination until UPS submitted proof of damages, giving DNJ an opportunity to

respond to that proof, as well. (Order 2). At this time, UPS has submitted its proof and DNJ has failed to respond.

## II.     DISCUSSION

### A.     The Court awards UPS $7,778,676 in damages.

"Federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996). When state substantive law governs a claim for relief, that state's law and decisions guide the allowable damages. *Id*. at 437 (citations omitted). The Agreement provides for Kentucky law to govern any dispute between the parties. (Pl.'s Compl. Ex. 1, ¶ 11.1, DN 1-2). Although the Agreement was amended in 2015 and provided for Florida law to govern any dispute arising between the parties, the parties have used Kentucky law to guide their pleadings throughout this dispute. (Pl.'s Compl. Ex. 1, at 22; Def.'s Mot. Dismiss 7, DN 12-1; Pl.'s Resp. Def.'s Mot. Dismiss 8, DN 15). As such, the Court will apply Kentucky law to evaluate UPS's $7,778,676 damages request.

    Although the Court has granted default judgment in favor of UPS, UPS agrees that it must still prove damages because "in an action for unliquidated damages, a defaulting party admits liability but not the amount of damages." *Howard v. Fountain*, 749 S.W.2d 690, 693 (Ky. App. 1988) (citations omitted). Kentucky law also governs UPS's burden of proof in its damages request because "'[t]he burden of proof' is a '"substantive" aspect of a claim.'" *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (citations omitted). Under Kentucky law, "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985) (quoting Restatements (Second) of Contracts, § 352 (1981)).

UPS supports its $7,778,676 damages claim with expert opinions and supporting documentation. UPS's damages expert, David Bones ("Bones"), "is a Certified Valuation Analyst®, and has been assisting clients investigate, analyze, and resolve their complex litigation disputes for over 16 years." (Bones Decl. Attachment A, at 1, DN 91).

Although DNJ serviced UPS at three different airports, Bones calculated damages corresponding only to the services DNJ provided to UPS at Miami International Airport and only for packages shipped to five locations internationally. (Bones Decl. ¶ 10, DN 91). In coming to his total, Bones "reviewed more than 300 invoices submitted by DNJ to UPS for freight forwarding services provided at [Miami International Airport] pursuant to the Agreement from September 15, 2010 to July 5, 2016[.]" (Bones Decl. ¶ 11). Bones selected the first invoice for each month from September 2010 to July 2016 for a total of 69 sampled invoices. (Bones Decl. ¶ 13). According to Bones, the sampled invoices represented $11.4 million of the $54.1 million invoiced from DNJ to UPS. (Bones Decl. ¶ 13). Bones compared DNJ's invoices with air waybill data, which is data generated by a specific airline evidencing the true weight of what was carried by that airline on a flight. (Bones Decl. ¶ 14).

Bones provided an example of one of his comparisons:

For example, according to invoice #14831, DNJ billed UPS $29,225 for an 8,750 kilogram shipment on July 20, 2015 to [Buenos Aires, Argentina]. According to the corresponding [air waybill], #045-97890494, only 609 kilograms of packages were actually shipped. This represents a difference of 8,141 kilograms in weight billed versus shipped. Based on a $3.34 implied rate per kilogram from the invoice (i.e., $29,225 / 8,750 = $3.34), DNJ overbilled by $27,191 (i.e., $3.34 x 8,141 = $27,191).

(Bones Decl. ¶ 14). While acknowledging that "the magnitude of the overbilling was not always as severe as the example above throughout the entire time period," Bones noted that "the ratio of the billed weight (i.e., weight on the invoice) to the actual weight (i.e., weight on the AWB)

increased over time." (Bones Decl. ¶ 15). "The ratio, averaged by month, was approximately 2x in 2011, 4x by mid-2013, 8x by mid-2015, and over 12x by early-2016." (Bones Decl. ¶ 15). Notably, "[t]he ratio declined significantly from its peak in early-2016 after UPS raised concerns regarding DNJ's billing practices." (Bones Decl. ¶ 15).

Based on this methodology, Bones "concluded that DNJ overbilled UPS by approximately $8.1 million out of the $11.4 million in sampled invoices." (Bones Decl. ¶ 16). He noted that "[t]his level of overbilling is also reflected in the difference between the amount billed to UPS by DNJ, compared to the amount DNJ paid to its carriers." (Bones Decl. ¶ 17). For example, "[w]hile DNJ billed approximately $54.1 million to UPS during the Contract Period, DNJ only paid approximately $10.2 million to LAN Cargo, the carrier DNJ used for [Miami International Airport] routes." (Bones Decl. ¶ 17). Bones also noted that "the difference between amounts DNJ billed to UPS and paid to LAN Cargo increase dramatically over time, consistent with the rate of overbilling" from year to year. (Bones Decl. ¶ 17).

So, "[a]fter accounting for the total amounts held-back by UPS, the total damages related to DNJ's overbilling, as calculated according to the methodology described above, is at least $7.8 million." (Bones Decl. ¶ 19). The final number reached by Bones was $7,778,676. (Bones Decl. ¶ 22). Bones also conducted an alternative analysis, reflecting DNJ's allegation that it possessed a "pivot weight agreement"[1] with UPS, ultimately concluding that "the total level of overbilling under this alternative approach was within 1% of the amount calculated by my primary analysis." (Bones Decl. ¶ 21).

---

[1] "A pivot weight agreement is one in which a shipper pays a minimum charge for a specified weight per PMC or LD8 container, above which an additional charge per kilogram applies." (Bones Decl. ¶ 20). "For example, if the pivot weight for a PMC is 1,500 kilograms, and UPS purchases one PMC for the flight, UPS would pay DNJ for 1,500 kilograms (even if the weight of UPS's packages shipped on that flight weighed less than 1,500 kilograms)." (Bones Decl. 6 n.12).

5

After review of Bones' calculations, the Court takes no issue with his calculation methodology. The Court's review of the supporting documentation evidences overbilling that increased from year to year in accordance with Bones' ratios and month-to-month samples. Although UPS did not provide exact damages calculations, this would require comparing the thousands of invoices between DNJ and UPS with the thousands of invoices between DNJ and the corresponding airline. "Kentucky law does not require [a party] to provide exact calculations of its damage—an estimation may suffice if it proves damages with 'reasonable certainty.'" *Gibson v. Ky. Farm Bureau Mut. Ins. Co.*, 328 S.W.3d 195, 205 (Ky. App. 2010). Bones' mathematical estimation of damages, in conjunction with the supporting documentation provided, convince this Court to find that UPS proved with reasonable certainty $7,778,676 in damages. As such, the Court awards UPS $7,778,676 in damages.

### B. The Court awards UPS pre- and postjudgment interest.

Regarding UPS's request for pre- and postjudgment interest, "[i]n diversity cases in this Circuit, federal law controls postjudgment interest but state law governs awards of prejudgment interest." *F.D.I.C. v. First Heights Bank,* FSB, 229 F.3d 528, 542 (6th Cir. 2000) (citing *Clissold v. St. Louis-San Francisco Rwy. Co.*, 600 F.2d 35, 39 n.3 (6th Cir. 1979)). As it relates to the granting of prejudgment interest, Kentucky law provides that "[e]xcept as provided in subsection[] . . . (4) of this section, a judgment, including a judgment for prejudgment interest, shall bear six percent (6%) interest compounded annually from the date the judgment is entered. A judgment may be for the principal and accrued interest." KRS 360.040(1). It further provides:

> When a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than six percent (6%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than six percent (6%). All interested parties must have due notice of said hearing.

KRS 360.040(4).

Although the statute speaks in mandatory terms, Kentucky courts have held that "[a]n award of interest on unliquidated claims is subject to the discretion of the trial court." *Ison v. Robinson*, 411 S.W.3d 766, 774 (Ky. App. 2013) (citing *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136 (Ky. 1991)). KRS 360.040's amendment in 2017 did not change that rule. *Ky. Tax Bill Servicing, Inc. v. Fultz*, 567 S.W.3d 148, 153 (Ky. App. 2018). "[T]he award of interest is left to judicial discretion . . . in light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him." *Nucor*, 812 S.W.2d at 144 (quoting Restatement (Second) of Contracts § 354 cmt. d. (June 2019 update)). In the present case, the intentional and escalating misstatements by DNJ certainly justify imposition of prejudgment interest at the Kentucky statutory rate of 6% as compensation to UPS for the time value of the overpayments DNJ wrongfully obtained under the contracts.

As to postjudgment interest, 28 U.S.C. § 1961 "mandates the imposition of post-judgment interest, thus removing the award of such interest from the discretion of the District Court." *Bricklayers' Pension Tr. Fund v. Taiariol*, 671 F.2d 988, 989 (6th Cir. 1982) (citing *Clissold v. St. Louis-San Francisco Ry. Co.*, 600 F.2d 35, 39 n.3 (6th Cir. 1979); *Blair v. Durham*, 139 F.2d 260, 261 (6th Cir. 1943)). As such, the Court awards UPS postjudgment interest pursuant to the terms and requirement of 28 U.S.C. § 1961.

### C. The Court awards UPS costs upon submission of its bill of costs but denies its request for attorneys' fees.

With regard to UPS's request for costs, "[t]he award of costs is governed by federal law." 10 Charles Alan Wright et al., *Federal Practice and Procedure* § 2669 (4th ed. Aug. 2019 update). "The award of costs in federal court is governed by Rule 54(d), rather than by state law that conflicts with Rule 54." *Humann v. KEM Elec. Coop., Inc.*, 497 F.3d 810, 813 (8th Cir. 2007) (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1223 (3d Cir. 1995); 10 Wright et al., *supra*, §

7

2669). "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "This language creates a presumption in favor of awarding costs, but allows denial of costs at the discretion of the trial court." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir. 1986). Although UPS makes no argument as to why it should be granted costs, the Court discerns no reason to rebut the presumption in favor of granting costs. As such, the Court will grant UPS's request for costs.

Regarding UPS's request for attorney fees, "[i]n diversity cases, attorneys' fees are governed by state law." *Hometown Folks, LLC v. S&B Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011) (citation omitted). "Kentucky courts apply the so-called American Rule regarding attorney's fees. That rule requires parties to pay their own fees and costs and does not allow, as in the English courts, for the shifting of the prevailing party's fees to the loser." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 787 (Ky. 2017) (internal quotation marks omitted) (quoting *Rumpel v. Rumpel*, 438 S.W.3d 354, 360 (Ky. 2014)). "[W]ith the exception of a specific contractual provision allowing for recovery of attorneys' fees or a fee-shifting statute, . . . each party assumes responsibility for his or her own attorneys' fees." *Aetna Cas. & Sur. Co. v. Commonwealth, Natural Resources & Envtl. Prot. Cabinet*, 179 S.W.3d 830, 842 (Ky. 2005) (citation omitted). That being said, "the general rule disallowing attorney fees in the absence of a statute or contract providing for such fees does not 'abolish the equitable rule that an award of counsel fees is within the discretion of the court depending on the circumstances of each particular case.'" *Mo-Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 906 (Ky. App. 2015) (quoting *Batson v. Clark*, 980 S.W.2d 566, 577 (Ky. App. 1998)).

UPS identifies no contractual provision or fee-shifting statute applicable in this case to support its claim for attorneys' fees. Nor does UPS make any argument as to why equity dictates an award of attorneys' fees in its favor. Awarding UPS attorneys' fees appears to act as an extension of the sanction already imposed on it, i.e., the grant of default judgment in its favor. "[T]he only appropriate award of attorney's fees as a sanction comes when the very integrity of the *court* is in issue." *Bell v. Commonwealth, Cabinet for Health & Family Servs., Dep't for Cmty. Based Servs.*, 423 S.W.3d 742, 749 (Ky. 2014) (emphasis in original). An award of attorneys' fees as a sanction is appropriate when a party's actions "cause unnecessary delay or needless increase in the cost of litigation." *Id*. (citation omitted). "Attorney's fees may also be ordered under Civil Rule 37.02 for failing to comply with a court order." *Id*. Finally, "attorney's fees may be awarded in a contempt action[] because the conduct undermined the authority of the court." *Id*. (citing *Ky. Retirement Sys. v. Foster*, 338 S.W.3d 788, 803 (Ky. App. 2010)).

In the case *sub judice*, the Magistrate Judge found that DNJ willfully and in bad faith failed to cooperate in discovery. (R&R 8-10). Notably, DNJ failed to appear at two pretrial conferences and disobeyed four pretrial orders. (R&R 8). DNJ also needlessly delayed litigation by eight months for allegedly attempting to secure new counsel but never did. (R&R 10). That being said, the Court has already sanctioned DNJ by granting default judgment in favor of UPS, and it does not appear that equity dictates the imposition of any further sanction. As such, the Court denies UPS's request for attorneys' fees.

### III.  CONCLUSION

Finding that UPS has sufficiently proved its damages "with reasonable certainty," **IT IS HEREBY ORDERED** that Plaintiffs are awarded damages in amount of $7,778,676 plus prejudgment interest at the Kentucky statutory rate of 6% and postjudgment interest at a rate of

9

1.81% pursuant to 28 U.S.C. § 1961.  Costs shall be awarded to UPS upon the submission of a bill of costs to the Court.  *See* 28 U.S.C. § 1920.

Greg N. Stivers, Chief Judge
United States District Court

September 18, 2019

cc: counsel of record
DNJ Logistics Group, Inc., 7045 NW 46th St., Miami, FL  33166
Ralph Nabavi, 10654 Stonebridge Blvd., Boca Raton, FL  33498